No. 02-361

IN THE SUPREME COURT OF THE STATE OF MONTANA

2003 MT 84

IN RE THE MARRIAGE OF:

LISA JANE BANKA,

       Petitioner, Respondent
       and Cross-Appellant,

   and

DOUGLAS CHARLES BANKA,

       Respondent and Appellant.


APPEAL FROM:    District Court of the Ninth Judicial District,
                     In and for the County of Pondera, Cause No. DR-99-24,
                     The Honorable Marc G. Buyske, Judge presiding.


COUNSEL OF RECORD:

       For Appellant:

       Shari M. Gianarelli, Gianarelli Law Office, PLLC, Conrad, Montana

       For Respondent and Cross-Appellant:

       John K. Kurtz, Kurtz Law Office, Helena, Montana


Submitted on Briefs: November 26, 2002

Decided:   April 17, 2003

Filed:

_____
                     Clerk

Justice Jim Regnier delivered the Opinion of the Court.

¶1      Douglas Banka ("Doug") appeals a Child Support Order and the Order Denying Request to Alter or Amend Judgment from the Ninth Judicial District, Pondera County. Lisa Banka ("Lisa") cross-appeals. We reverse in part and affirm in part.

¶2      We address the following issues on appeal:

¶3      1. Did the District Court err in denying retroactive application of its child support order?

¶4      2. Did the District Court err when it ordered the children be returned to Lisa four days before the start of the school year?

¶5      3. Did the District Court err in excluding Doug's premarital property from the marital estate?

¶6      4. Did the District Court err in its child support calculation by failing to consider all of Doug's available income?

BACKGROUND

¶7      Lisa filed a Petition for Dissolution of her marriage to Doug on December 15, 1997. In her Petition, Lisa requested child support for their two minor children. While the Petition was pending, Lisa asked the Child Support Enforcement Division of the Montana Department of Public Health and Human Services ("CSED") to set child support. After gathering information about the parties' incomes, CSED issued a Notice of Temporary Support Obligation requiring Doug to pay child support to Lisa. Both parties disputed the amount set by CSED and a contested hearing was set.

2

¶8 After the hearing, on January 2, 2001, CSED issued an order entitled Proposed Order: Temporary Financial and Medical Support Obligation Decision and Order ("Proposed Order") setting Doug's child support obligation at $1522 per month beginning February 1, 2001. CSED also awarded judgment in favor of itself for past due child support of $19,786 for the period of January 2000, through January 2001. The Proposed Order stated that either party could challenge it based upon certain circumstances within twenty days; neither party did so at that time. On January 23, 2001, CSED entered another order, entitled Final Order: Temporary Financial and Medical Support Obligation Decision and Order ("Final Order").

¶9 On February 5, 2001, Doug filed a Petition for Judicial Review of the Final Order in the District Court of Pondera County. In a letter to Doug's attorney, a staff attorney for CSED stated that the order was not subject to judicial review. The attorney further stated that the CSED order was not binding on the District Court and that the District Court could enter an order that would wholly replace the CSED temporary order. After being advised by CSED that the order was not appealable to the District Court, Doug, Lisa and CSED entered into a joint stipulation to dismiss Doug's petition for judicial review stating:

> [T]he Order entered by the Administrative Law Judge is a temporary order only, is not subject to judicial review, and is not binding upon the District Court *in the pending Dissolution of Marriage action presently pending before this Court.* The parties acknowledge that the District Court retains authority to enter its own order for child support which will supersede the temporary order entered by CSED. [Emphasis added.]

Judge Marc Buyske then dismissed the Petition for Judicial Review.

3

¶10    The District Court held a hearing on the Petition for Dissolution on June 8, 2001. At the hearing, the District Court heard evidence on issues including the calculation of child support, whether it was in the best interest of the children for them to be returned to Lisa's residence two weeks prior to the start of school, and what was included in Doug and Lisa's marital estate.

¶11    The District Court entered an order on September 12, 2001, addressing all issues except for child support. A Child Support Order was entered subsequently on December 31, 2001. Doug filed a Motion to Alter or Amend Judgment regarding the Child Support Order pursuant to Rule 59(g), M.R.Civ.P. The District Court denied the motion. Doug appeals the District Court's refusal to apply its Child Support Order retroactively. Lisa cross-appeals the District Court's decision regarding when the children are to be returned to her prior to the start of the school year, the determination of what constitutes a martial asset, and the calculation of child support.

DISCUSSION

ISSUE ONE

¶12    Did the District Court err in denying retroactive application of its child support order?

¶13    We review a district court's award of child support to determine whether the district court abused its discretion. *In re Marriage of Bee*, 2002 MT 49, ¶ 19, 309 Mont. 34, ¶ 19, 43 P.3d 903, ¶ 19. In determining child support retroactivity, we will not disturb the award made by the district court unless a clear abuse of discretion resulting in substantial prejudice is shown. *In re Marriage of Franks* (1996), 275 Mont. 66, 71, 909 P.2d 712, 715.

4

¶14     In its Child Support Order issued December 31, 2001, the District Court ordered Doug to pay $524 per month to Lisa for the support, care, and maintenance of their children beginning on January 1, 2002, approximately a thousand dollars per month less than he had been ordered to pay by CSED. Doug then filed a Motion to Alter or Amend the Child Support Order, requesting the District Court apply its December 31, 2001, order retroactively beginning January 1, 2000.

¶15     The District Court denied Doug's motion. Citing *Lee v. USAA Cas. Ins. Co.*, 2001 MT 59, 304 Mont. 356, 22 P.3d 631 and *Nelson v. Driscoll* (1997), 285 Mont. 355, 948 P.2d 256, the District Court stated that a motion to amend or alter judgment, pursuant to Rule 59(g), M.R.Civ.P., cannot be used to raise arguments which could, and should have been made before judgment issued, nor is the motion intended to routinely give litigants a second bite at the apple, but to afford an opportunity for relief in extraordinary circumstances. The District Court apparently concluded that Doug did not raise the retroactivity issue in his pleadings. The District Court also pointed out that Doug had sought judicial review of CSED's Final Order, but later dropped it. In addition, the District Court noted that CSED was not made a party to the proceeding, citing § 40-5-202(5)(a), MCA.

¶16     First, we address Doug's contention that the District Court erred by holding that Doug did not preserve his right to request that the District Court's support order be applied retroactively. Doug is correct that the issue of prospective and retroactive child support was raised by both parties throughout the proceeding. Doug was highly critical of Lisa's expert in both the CSED and court hearings. Wage and financial information was provided to the

5

District Court dating back to 1996. Doug requested that the District Court retroactively modify the CSED support order through his testimony and Proposed Findings of Fact and Conclusions of Law he submitted to the District Court. We conclude that Doug adequately presented the issue of retroactive child support to the District Court.

¶17 Next, we address the issue of notice to CSED. The District Court points out that no notice was given to CSED, as required by statute. Section 40-5-202(5)(a), MCA, states that when the Department of Health and Human Services is providing IV-D services, the Department must be afforded notice and an opportunity to participate as an independent party in any proceeding relating to modification of a support obligation. The IV-D services referenced in § 40-5-202(5)(a), MCA, refers to title IV-D of the Social Security Act.

¶18 Doug argues on appeal that CSED was not entitled to notice of the District Court proceedings because Lisa did not receive IV-D services. Doug is mistaken on this assumption. A IV-D agency is defined as "the single and separate organizational unit [with the] responsibility for administering or supervising the requirements of title IV-D of the [Social Security] Act." 45 C.F.R. § 301.1. Montana's agency charged with that task is CSED. Thus, by virtue of the fact that Lisa was seeking child support through CSED, she was receiving IV-D services.

¶19 Today, we reaffirm that CSED is entitled to notice and an opportunity to participate in District Court proceedings relating to a modification of a support obligation ordered by CSED, as required by § 40-5-202(5)(a), MCA. Under the facts presented, however, we conclude that CSED had actual notice of the dissolution proceeding. The stipulation

6

executed by CSED's staff attorney acknowledged that the "Order . . . is not binding upon the Dissolution of Marriage action presently pending before this Court." Therefore, any statutory notice required to CSED was satisfied by actual notice. The discussion and dialogue between CSED and the parties, as evidenced by the stipulation, indicates that CSED was reasonably informed of the pending dissolution proceeding, that child support was at issue, and was aware of the names of the parties and children involved, and the location of the tribunal. *See* § 40-5-202(5)(a), MCA. We further note that in its amicus brief, CSED did not request that we vacate this matter because notice provisions were not satisfied, and order the parties to hold an entirely new proceeding, inviting CSED to participate.

¶20 The District Court was incorrect in its determination that it could not retroactively supercede CSED's order and replace it with its own order. Section 40-5-225(3), MCA, states:

> If a support action is pending in district court and a temporary or permanent support obligation has not been ordered . . . [CSED] may enter an order requiring a child's parent or parents to pay an amount each month for the temporary support of the child pending entry of a support order by the district court.

If there is an action in the district court and it has not provided for child support, then CSED may enter an order for temporary support, until the district court makes its order. As stated by CSED in its amicus brief, the very nature of a temporary order contemplates its supersession by the district court. In sum, the District Court erred when it held that it did not have authority to retroactively modify CSED's support order. Further, under the facts presented, CSED had actual notice of the dissolution proceeding and chose not to participate.

7

In conclusion, we hold that Doug's motion to alter or amend judgment should have be granted and it was an abuse of discretion for the District Court not to do so.

ISSUE TWO

¶21 Did the District Court err when it ordered the children be returned to Lisa four days before the start of the school year?

¶22 A district court's findings regarding parenting issues will be sustained unless the findings are clearly erroneous. *In re the Marriage of Burk*, 2002 MT 173, ¶ 16, 310 Mont. 498, ¶ 16, 51 P.3d 1149, ¶ 16.

¶23 Lisa and Doug stipulated to a Parenting Plan in which they agreed that during the school year, the children would live primarily with Lisa, with Doug having the children for the majority of weekends. During summers, Doug was to have extended parental contact during the week, with Lisa entitled to have the children for the majority of weekends. The parties agreed that Lisa would be permitted to take the children on an uninterrupted two-week vacation during the first two weeks of August.

¶24 One of the few aspects of the Parenting Plan Lisa and Doug could not agree upon was the time period the children needed to spend with Lisa prior to the start of the school year in order to readjust to her home. In the District Court, Lisa argued that the children needed a two-week period with her before the start of school to readjust to living in her home. Lisa essentially requested that the District Court grant her custody of the children for the entire month of August. Debra O'Brien, the children's counselor, testified that the Banka children need two weeks to readjust to Lisa's home and that they could be harmed if they did not have

8

this period to readjust. She also testified that indications of readjustment problems include sleeplessness, mood swings, crying spells, aggressive behavior, hostility, and anger, all of which the Banka children had exhibited in the past upon return from Doug's residence.

¶25 Doug called psychologist Dr. Monte Kuka as a witness to give his opinion as to the appropriate readjustment period for the children prior to the start of school. Dr. Kuka testified that children who frequently move between households, as the Banka children do, are less likely to experience adjustment problems. Dr. Kuka stated that for some children, a readjustment period of one or two days would be sufficient. Evidence presented in the District Court also showed that because Lisa works full-time, the children would be placed in child care during the proposed two-week readjustment period. Both Doug and Dr. Kuka testified that it would be in the best interest of the children for them to spend those two weeks with Doug, rather than have them spend their days in day care while residing with Lisa.

¶26 In its Findings of Fact, Conclusions of Law, Judgment and Order dated September 11, 2001, the District Court ordered that after their two-week vacation with Lisa, the children are to be returned to Doug until four days prior to the start of school.

¶27 On appeal, Lisa argues that no evidence was presented to support the District Court's holding on this issue. She claims that she presented the sole evidence on the appropriate period for readjustment prior to the start of school. This, however, is not true. Lisa and Doug presented conflicting expert testimony. After reviewing the evidence before it, the District Court concluded that four days was an appropriate length of time to allow the

9

children to readjust to Lisa's home at the end of the summer, prior to the start of school. Regarding conflicting expert testimony, we have stated:

> Where there are conflicts in the testimony, it is the function of the trier of fact to resolve those conflicts. We will not substitute our judgment for that of the trier of fact as the trial court is in a better position than this Court to resolve child custody issues.

*In re Marriage of McKenna*, 2000 MT 58, ¶ 17, 299 Mont. 13, ¶ 17, 1996 P.2d 386, ¶ 17 (citations omitted). We have also stated that "it is the District Court's determination of the children's best interest, not the expert witnesses' opinion, that controls." *In re Marriage of Rolfe* (1985), 216 Mont. 39, 45, 699 P.2d 79, 82.

¶28 We hold that the District Court's finding on this issue is not clearly erroneous. The District Court's decision that it is in the best interest of the children to return to Lisa four days prior to the start of school is supported by evidence in the record.

## ISSUE THREE

¶29 Did the District Court err in excluding Doug's premarital property from the marital estate?

¶30 We review a district court's division of marital property to determine whether the findings on which it relied are clearly erroneous. *In re Marriage of Engen*, 1998 MT 153, ¶ 26, 289 Mont. 299, ¶ 26, 961 P.2d 738, ¶ 26. If the findings are not clearly erroneous, we will affirm the distribution of property unless the district court abused its discretion. *Engen*, ¶ 26. In a marriage dissolution proceeding, the test for an abuse of discretion is whether the

district court acted arbitrarily without employment of conscientious judgment or exceeded the bounds of reason resulting in substantial injustice. *Engen*, ¶ 26.

¶31 Lisa argues on appeal that the District Court erred in excluding some of Doug's premarital property in the marital estate. Section 40-4-202, MCA, requires that in dividing property acquired prior to marriage, the court shall consider a homemaker's non-monetary contributions and the extent to which such contributions facilitated the maintenance of the property.

¶32 Farming and ranching has been Doug's main source of income for most of his adult life. Doug acquired the majority of his farm and ranch assets prior to his marriage to Lisa, and Lisa brought no significant assets to the marriage. Lisa worked full-time outside of the home for almost the entire marriage. Many of the Banka family's expenses, such as groceries, living expenses, Individual Retirement Account contributions, and vehicle payments, were paid out of the farm account.

¶33 The District Court made extensive findings regarding the parties' financial relationships. The court noted that Lisa worked full-time outside the home during the marriage and maintained a separate bank account solely in her name. Doug had no access to the account or any input on how the money was spent. The District Court determined that Lisa's involvement with the farm was minimal. Lisa took her vacation with the children during harvest time and did not help with any of the farm chores during this busy time of the year. The court found that no credible evidence was presented that the value of the operation appreciated during the marriage. The court further determined that none of Lisa's income

11

was used to pay farm and ranch expenses and the family expenses paid from her income were not a significant contribution to the preservation or maintenance of the farm and ranch operation.

¶34    We conclude that the District Court's findings are not clearly erroneous and the court did not abuse its discretion in concluding that the farm's assets were Doug's non-marital property.  Section 40-4-202(1), MCA, directs the district court to consider the nonmonetary contributions of a homemaker, the extent such contributions facilitated the maintenance of the property and whether the division serves as an alternative to maintenance arrangements. Here, maintenance is not an issue.  The District Court did consider Lisa's arguments that she made contributions as a homemaker and paid some family expenses with her income but concluded that neither significantly resulted in maintenance of the farm and ranch property. We agree with the District Court.  As we stated in *Engen*, a district court cannot distribute to the non-acquiring spouse property acquired before the marriage where there is no evidence that the spouse made any contribution to the assets in any form. *Engen*, ¶ 40.

ISSUE FOUR

¶35    Did the District Court err in its child support calculation by failing to consider all of Doug's available income?

¶36    As we stated above, we review a district court's award of child support to determine whether the District Court abused its discretion.  *Bee*, ¶ 19.

¶37    Lisa called Nicholas Bourdeau ("Bourdeau") to testify before the District Court as an expert witness regarding Doug's child support obligations.  In order to determine Doug's

"true" income, Bourdeau averaged the annual increase in the parties' assets over the term of their marriage, factored in their standard of living, added Doug's "stated income" and then deducted Lisa's financial contribution.

¶38 The District Court responded to this argument when it held that the increases in Doug's net worth were not the result of any additional earned income, but the product of market forces. In its Child Support Order dated December 31, 2001, the District Court made the following findings:

12. No evidence was presented that Respondent is using income otherwise available for child support to acquire wealth in the form of securities or other investment assets.

13. No evidence was presented that Respondent used income otherwise available for child support to reduce debt other than in the ordinary course of business.

14. The evidence suggests most, if not all, of any increase in Respondent's net worth is due to market conditions.

15. Except as otherwise noted in these Findings of Fact and Conclusions of Law, the evidence before the Court demonstrates the income of Respondent as a self-employed farmer is reflected in his tax returns.

¶39 Bourdeau also used a second method to calculate Doug's child support obligation. This second method involved imputing income to Doug's unproductive assets based upon a rate of return of 6.03%. Bourdeau reasoned that an individual will sell or cease activities related to a non-productive asset and work at his full capacity. As a result of applying this method, Bourdeau imputed an additional $31,310 to Doug as an agricultural supervisor pursuant to the 1998 Montana State Occupational Employment and Wage Estimate.

13

¶40 Bourdeau would have Doug pay child support not only on income he actually earned, but for income he could earn if he liquidated all his farming assets. Precedent exists supporting the District Court's decision to reject Bourdeau's reasoning. In several cases, we have held that it would be unjust to attribute income to assets that are used to *produce* income. *See In re Marriage of Mitchell* (1987), 229 Mont. 242, 746 P.2d 598; *In re Marriage of Hunt* (1994), 264 Mont. 159, 870 P.2d 720.

¶41 Furthermore, Bourdeau's argument that Doug should be imputed as an agricultural supervisor is without merit. The record contains no evidence that Doug is under-employed. We agree with the District Court's description of Bourdeau's reasoning as "alchemy at its best."

¶42 For the reasons set forth herein, we reverse as to Doug's appeal, and affirm the District Court as to Lisa's issues on cross-appeal.

/S/ JIM REGNIER

We Concur:

/S/ KARLA M. GRAY
/S/ PATRICIA COTTER
/S/ TERRY N. TRIEWEILER
/S/ JIM RICE

14